## HEIRS OF SZYMANSKI *v.* ZUNTS.[1]

*(Circuit Court, E. D. Louisiana.*  April 10, 1884.)

**1. CONFISCATION ACT OF 1862, (12 ST. 589.)**
> The effect of the statute of confiscation of 1862, (12 St. 589,) modified by the joint resolution, (12 St. 627,) is to take, by the decree of condemnation, from the offender all estate, leaving him only the naked capacity to transmit to his heirs.

**2. SAME—WARRANTY.**
> The decree of confiscation of the property separated it from any power or dominion over it on the part of the offender after the commission of the act for which it was condemned. His warranty, therefore, has no effect upon the *res* which has vested in the plaintiffs because it had been once a portion of the estate of their ancestor.

**3. SAME—INJUNCTION.**
> The only effect which could be invoked from the violation of the warranty would be, that, for reasons disconnected from the confiscated property, namely, because other property of the ancestor warrantor had come into the possession of the plaintiffs as heirs, a right of action against them exists in the defendant upon the ancestor's warranty. This, if it were all conceded, (and upon this no opinion is given,) would give no right to enjoin the suit at law. It would present the case of two parties having each a cause of action against the other, one at law and the other in equity, where each must take its natural course, and come to its conclusion without any interference springing up from the existence or progress of the other.

**4. PRACTICE.**
> The provisions of article 375 of the Code of Practice of Louisiana are merely regulations of procedure operative upon the courts of the state alone, and not applicable in the courts of the United States, where, as here, the demand in the first suit is a demand upon the law side of the court, and the counter demand on the part of the defendant is one which is of equity cognizance. In such a case, the question whether a stay will be granted will be controlled by the rules which determine the action of courts of equity in the United States courts.

**5. SAME—INJUNCTIONS.**
> It is a rule of practice in the circuit courts of the United States not to allow an injunction to stay an ejectment until it can be investigated in equity, unless a judgment be entered therein. *Turner* v. *American Missionary Society,* 5 McLean, 344, followed.

On Motion to Stay Proceedings.

*E. H. Farrar,* for plaintiffs.

*Wm. F. & Delos C. Mellon* and *James E. Zunts, Jr.,* for defendant.

BILLINGS, J.   A motion is submitted to stay proceedings in this action until the plaintiffs have entered an appearance and pleaded in a suit in equity, filed in this court by the defendant against the plaintiffs. This suit is an action of ejectment brought by the heirs of a person whose real estate had been confiscated under the act of 1862, and for rents and profits. The suit in equity is based upon a warranty which the plaintiffs' ancestor, whose property had been confiscated, and who subsequently acquired apparent title to the same, entered into with the remote grantors of the defendant, and seeks to discover and charge the plaintiffs with the amount and value of prop-

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

erty, independent of that confiscated, which descended to them, as heirs, from the estate of their ancestor, who is thus the remote warrantor of the defendant. What is the relation of these two demands to each other? The answer to this question, so far as concerns the demands intrinsically, depends in part upon the effect of the putting in operation of the statute of confiscation. Article 3, § 3, last paragraph, of the constitution of the United States declares that "no attainder of treason shall work corruption of blood or forfeiture, except during the life of the person attainted." The statute (vol. 12, p. 589) had in terms permitted the forfeiture of real estate absolutely. The object of the joint resolution (vol. 12, p. 627) was to limit the forfeiture by the article of the constitution above quoted with reference to the punishment of treason. The meaning of the constitution is determined by this object, and therefore was that the offense should work no corruption of blood, which, when applied to a specific piece of property, is but another form of the expression, "or forfeiture during the life" of the offender. For if the forfeiture stopped with the life of the person in whom the estate was vested, it would follow that there would be a transmission, upon his death, of the property as if there had been no forfeiture; i. e., there would remain in the offender no estate, but only the power to transmit. Blackstone says (book 4, p. 382) that the justice of the punishment of treason, by corrupting the blood, was founded upon the consideration that he who had violated the fundamental principles of government had broken his part of the compact between the king and the people, had abandoned his connections with society, and therefore had no right to those advantages which belonged to him purely as a member of society, among which social advantages the right of transferring or transmitting property to others is one of the chief. Subsequently, by the statutes of Anne, and upon the union with Scotland, this posthumous punishment of innocent heirs was abated upon principles of clemency, which undoubtedly moved the framers of the constitution to secure the prevention of attainder save by judicial sentence, and the restriction of any attempt or forfeiture to the life of the person attainted or punished.

The effect of the statute of confiscation of 1862, modified by the joint resolution, is to take by the decree of condemnation from the offender all estate, leaving him only the naked capacity to transmit to his heirs. The condemned property by the decree ceased to belong to the estate of the offender save for the single purpose of designating in whom it should vest upon his death. It follows that it separated it from any power or dominion over it on the part of the offender, after the commission of the act for which it was condemned. His warranty, therefore, has no effect upon the res which has vested in the plaintiffs, because it had been once a portion of the estate of their ancestor. The only effect which could be invoked from the violation of the warranty would be that for reasons disconnected from the con-

fiscal and property, namely, because other property of the ancestor warrantor had come into the possession of the plaintiffs as heirs, a right of action against them exists in the defendant upon the ancestor's warranty. This, if it were all conceded, (and upon this no opinion is given,) would give no right to enjoin the suit at law. It would present the case of two parties having each a cause of action against the other,—one at law, and the other in equity,—where each must take its natural course, and come to its conclusion without any interference springing up from the existence or progress of the other.

It remains next to be considered how far the statutes of the state of Louisiana affect this motion. It has been urged that the Code of Practice of this state, which authorized a reconventional demand in any cause or for any cause of action where the plaintiffs are, as here, non-residents and without the jurisdiction of the court, aids in establishing the right to maintain this rule on the part of plaintiffs. Code Pr. art. 375. It should be observed that the right to implead the plaintiffs for any demand is supplemented by the provision contained in article 194, which provides that "absent persons" shall be brought into court by service upon "a curator," whereas in the circuit courts of the United States jurisdiction is withheld unless the defendant be "an inhabitant of the district," or "be found" within the same. Nor do I find any enactment, either in the Code of Practice or Civil Code of this state, which creates any absolute right of set-off between two parties who are mutually indebted. The provisions contained in article 375 are therefore merely regulations of procedure operative upon the courts of the state alone, and not applicable in the courts of the United States, where, as here, the demand in the first suit is a demand upon the law side of the court, and the counter-demand on the part of the defendant is one which is of equity cognizance. In such a case the question whether a stay will be granted will be controlled by the rules which determine the action of courts of equity in the United States courts. These rules are not arbitrary. They are founded upon a further question, as to whether the offset is either a matter of legal right, made such by the law of the state, or is required in order to do justice between the parties. In this case there is no statutory offset. The case presents disconnected demands which are sought to be offset. In such a case the diligence of the parties, and the rules of the courts in which the respective claims must be presented, must work out the result. Neither suit can be accelerated nor retarded on account of the other. Especially must this be true when, as here, the suit sought to be stayed is a suit in ejectment; for it is a rule of practice in the circuit courts of the United States not to allow an injunction to stay an ejectment suit until it can be investigated in equity, unless a judgment be entered therein. *Turner* v. *American Missionary Society*, 5 McLean, 344. So far as I find precedents for this motion they are confined to cases where it is sought to compel an answer to a cross-bill, which, of course, must present a

matter necessarily connected with the demand of the plaintiff, and therefore necessarily involved in its just adjudication. Here the matters have no connection, except that they exist between the same parties.

The motion is denied.